**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| PAYRANGE LLC,<br><br>   *Plaintiff*,<br><br>v.<br><br>ALLIANCE LAUNDRY SYSTEMS LLC,<br><br>   *Defendant*. | Case No.<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ..................................................................................1

II.    PARTIES ............................................................................................4

III.   JURISDICTION AND VENUE ...........................................................4

IV.   FACTUAL ALLEGATIONS ...............................................................5

      A.     Overview of PayRange's Business ................................................5

      B.     Overview of Alliance's Business...................................................6

      C.     PayRange's BluKey Products........................................................7

      D.     Agreements Between PayRange and Alliance................................10

      E.     Alliance's Previous Efforts to Block Payment-Processing Competition..............13

      F.     Alliance Terminates the License and Misrepresents the Consequences................15

      G.     Alliance's Interference Creates Concern and Confusion for PayRange's Customers ..............19

      H.     Alliance Has Monopoly Power in the Market for Commercial Laundry Machines ..............22

            1.     The Relevant Markets..................................................22

            2.     Indirect Proof of Monopoly Power.............................24

            3.     Direct Proof of Monopoly Power ..............................24

      I.     Alliance's Restrictions Serve No Procompetitive End .........................25

      J.     Alliance Unlawfully Ties its Payment-Processing Technology to its Machines..............27

      K.     Alliance Locks In, Then Exploits, Its Machine Customers ..................30

      L.     Antitrust Injury.............................................................31

V.    CLAIMS FOR RELIEF .....................................................................33

      COUNT I - Violation of the Sherman and Clayton Acts - Tying, 15 U.S.C. §§ 1, 2, 14.................33

      COUNT II - Violation of the Sherman Act - Attempted Monopolization, 15 U.S.C. § 2................35

      COUNT III - False Advertising Under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) ................36

      COUNT IV - Tortious Interference with Contractual or Prospective Contractual Relationship ................38

      COUNT V - Trade Libel.................................................................41

COUNT VI - Defamation ..................................................................................................43

COUNT VII - Declaratory Judgment Pursuant to the Declaratory Judgment Act,
    28 U.S.C. §§ 2201-2202 ......................................................................................45

VI.   JURY TRIAL DEMAND ...........................................................................................46

VII.  PRAYER FOR RELIEF .............................................................................................46

Plaintiff PayRange LLC ("PayRange"), by and through the undersigned attorneys, files this Complaint against Defendant Alliance Laundry Systems LLC ("Defendant" or "Alliance") and hereby alleges as follows:

## I.    INTRODUCTION

1.    Through tireless work and innovation, PayRange has emerged as a leader in the market for commercial laundry payment processing. PayRange now stands to lose everything because of Alliance's campaign of misinformation. Alliance has sent threatening, misleading emails to PayRange's customers designed to intimidate these customers into abandoning PayRange's products in favor of Alliance's alternative, inferior product. Alliance reiterated its misrepresentations to customers in at least one conference call to reinforce this same false information. Alliance's misleading communications were designed to create confusion and fear among PayRange's customers, and it has worked.

2.    Alliance is a monopolist—or, at the very least, the dominant market player—in the market for payment-enabled commercial laundry machines and now seeks to unlawfully extend its dominance into the market for commercial laundry payment processing at the expense of PayRange and consumers. The aim of Alliance's scheme is to coerce PayRange's customers to abandon PayRange's products against their wishes and use Alliance's competing product instead.

3.    PayRange built its business by creating innovative technology that met an unsatisfied customer demand. By contrast, Alliance has obtained its commanding market share through acquisitions and is now seeking to solidify and leverage its market power through a campaign of intimidation. PayRange is bringing this action to halt and remedy Alliance's tortious interference, unfair business practices, and anticompetitive conduct, and to stop the imminent exodus of customers caused by Alliance's false communications.

1

4.    PayRange offers a cutting-edge, industry-leading mobile app-based payment solution and associated hardware that allows customers to pay for the use of machines—such as laundry, vending, and arcade machines—using a smartphone. This eliminates the need for cash or coins. For many years, laundry machine manufacturers such as Alliance have failed to innovate the consumer experience, leaving consumers to struggle with outdated interfaces, cumbersome coin-operated payment systems, and a lack of real-time data about the laundering of their important belongings.

5.    PayRange's acclaimed technology enables its customers to upgrade an unattended, coin-operated retail machine into a state-of-the-art mobile payment solution with a small module or dongle, called "BluKey." Commercial laundry equipment distributors and commercial laundry facility operators that adopt PayRange as their payment solutions provider purchase and install PayRange's applicable BluKey device into their machines, which then connects to individual users' mobile apps via Bluetooth technology. PayRange's mobile app communicates with BluKey to enable mobile transactions without the hassle of paying with coins. Users download the PayRange app, load funds, and swipe to pay at enabled machines, offering a convenient, contactless experience.

6.    PayRange supports over 15 million PayRange app users, more than 1,000,000 machines across the U.S. and Canada, and over 10,000 business operators. After integrating PayRange into their businesses, customers report savings of 20% in operational costs and revenue increases of 30%.

7.    Three of the main sectors that PayRange serves are laundromat operators, multifamily residential route laundry operators, and the commercial laundry equipment distributors who sell machines to these facility operators. Multifamily route laundry operators are

2

companies that operate and manage common-area laundry rooms in shared settings such as apartment complexes, condominiums, dormitories, government facilities, motels, or hotels. PayRange has spent more than twelve years building payment and management solutions for these industries. As of May 2026, approximately 75% of PayRange's revenue comes from the laundry industry.

8.      Alliance, as relevant to this case, manufactures, distributes, and sells commercial laundry equipment, including equipment with digital payment capabilities. Alliance touts itself as "the global leader in laundry solutions."[1] Alliance's product line includes five brands: Speed Queen, Huebsch, UniMac, IPSO, and Primus.[2] Alliance has been steadily amassing market share by acquiring these brands (Huebsch in 1973, UniMac in 1994, IPSO in 2006, and Primus in 2014). Alliance's market growth over time has been attributable to acquiring its competitors, not its innovative products or superior services. Alliance holds itself out as "the number one supplier of commercial laundry equipment in terms of market share in North America [defined to include the United States and Canada]."[3] Alliance estimates that it possesses "approximately 40% of the commercial laundry market in North America and [has] leading positions in growing markets around the world."[4] Alliance is also vertically integrating by acquiring distributors.

9.      Laundry machines (washers and dryers) are expensive, durable goods that often last for decades. Once purchased, the machines are owned by the customers (whether distributors, or

---

[1]  Alliance Laundry, *Our Story | Leading the Future of Laundry*, https://alliancelaundry.com/our-story (last visited May 29, 2026).

[2]  Alliance Laundry, *Our Brands | Global Laundry Leader*, https://alliancelaundry.com/our-brands (last visited May 29, 2026).

[3]  *See* Alliance Laundry Holdings Inc., Registration Statement (Form S-1) (Sept. 12, 2025), https://www.sec.gov/Archives/edgar/data/1317685/000131768525000013/alliancelaundryholdingsinc.htm.

[4]  *Id.*

3

the facility operators), who may then install additional components as they wish, including their choice in selecting third-party payment solution providers to add on to their machines, such as PayRange. This dispute arises over Alliance's attempt to use its market power to coerce PayRange's customers away from their preferred payment solution for the machines those customers own and toward Alliance's own payment product.

## II.    PARTIES

10.    PayRange LLC ("PayRange") is a limited liability company organized in Tennessee with its principal place of business at 9600 NE Cascades Parkway, Suite 280, Portland, Oregon, 97220.

11.    Alliance Laundry Systems LLC ("Alliance") is a limited liability company organized in Delaware with its principal place of business at 221 Shepard Street, Ripon, Wisconsin, 54971.

## III.    JURISDICTION AND VENUE

12.    The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1337(a) (commerce and antitrust regulation), as this action arises under the Sherman Act, 15 U.S.C. § 1 *et seq.*, the Clayton Antitrust Act, 15 U.S.C. § 12 *et seq.*, the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

13.    The Court has supplemental jurisdiction over PayRange's state-law claims under 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy as the Sherman Act, Clayton Antitrust Act, and Lanham Act claims, arising from a common nucleus of operative fact.

14.    The Court has authority to enter a declaratory judgment and to provide temporary, preliminary, and permanent injunctive relief pursuant to Federal Rules of Civil Procedure 57 and

65; the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable powers.

15.    For the reasons set forth herein, an actual and justiciable controversy exists under 15 U.S.C. § 1125(a) and 28 U.S.C. §§ 2201-2202 between PayRange and Alliance.

16.    Alliance is subject to personal jurisdiction in this Court because (1) on information and belief, Alliance conducts business in Wisconsin, including by distributing products or services in Wisconsin, and (2) because of Alliance's purposeful, systematic, and continuous contacts with Wisconsin.

17.    Venue is proper in this Court under 15 U.S.C. § 22 and 28 U.S.C. § 1391 because (1) a contract at issue in this suit (the March 5, 2018 Control Interface Specification License defined below) contains a forum selection clause providing that any litigation arising from or in connection with any dispute between the parties under that Control Interface Specification License shall be brought in the courts of Wisconsin; (2) Alliance is subject to personal jurisdiction in this Court; and (3) it would not be unduly burdensome for Alliance to litigate in this Court.

## IV.    FACTUAL ALLEGATIONS

### A.    Overview of PayRange's Business

18.    PayRange provides a simple and convenient mobile payment option for laundry machines. Users download the free mobile app from the Apple App or Google Play store. PayRange's app then provides users with flexible funding options including all major cards and wallets (Apple Pay, Google Pay, and PayPal). Through the app, users are also able to monitor the status of their laundry cycles and receive alerts with any updates or issues with the machines they are using. PayRange launched this "turnkey mobile payment system" in 2014.[5] In 2017, PayRange

---

[5] MKP Creative, *PayRange Introduces World's Simplest Payment Solution for Machines* (March 20, 2014),

publicly announced that, through its innovative research and development, it had successfully developed the capability to bring "the PayRange mobile payment service to virtually every coin operated laundry machine manufactured in the last 20 years."[6]

19.     PayRange manufactures a line of patented module devices or dongles, called BluKey. PayRange's customers (*e.g.*, commercial laundry facility operators and commercial laundry equipment distributors who choose PayRange as their payment services solution) then plug the BluKey dongle device into their individual washing machines or dryers. The individual user then connects via Bluetooth to PayRange's BluKey device using PayRange's mobile app. This Bluetooth connection to the PayRange mobile app allows the individual user to pay for and monitor their laundry. PayRange's BluKey devices can retrofit into existing, older machines while also working with new machines; and it is manufacturer-agnostic, meaning it works across machines sold by different machine manufacturers, including Alliance.

20.     In December 2025, PayRange announced that it acquired KioSoft Technologies, LLC ("KioSoft"), a payment solutions company that is now part of PayRange.

**B.      Overview of Alliance's Business**

21.     Alliance manufactures, sells, and distributes washing machines and dryers that are used by laundromat operators, multifamily route laundry operators, and commercial laundry equipment distributors. When these customers purchase their machines, they are able to choose what payment solutions service they want to use on their machines. Customers can choose

---

https://www.prweb.com/releases/payrange_introduces_world_s_simplest_payment_solution_for_machines/prweb11674676.htm (last visited May 29, 2026).

[6] PayRange, *PayRange Adds Compatibility to Millions of Existing Coin-Op Washers and Dryers*, (Dec. 13, 2017), https://www.prnewswire.com/news-releases/payrange-adds-compatibility-to-millions-of-existing-coin-op-washers-and-dryers-300570739.html (last visited May 29, 2026).

6

PayRange's products, or another offering by another payment-solution provider, to incorporate into the Alliance machines. Alliance has started developing and selling its own competing payment solutions service that customers can choose to use in connection with the machines they purchase from Alliance.

22.     In the last several years, Alliance has rapidly acquired companies that distribute its machines, strengthening its grip on the market for commercial laundry machines. Such recent distributor acquisitions occurred in July 2024,[7] September 2024,[8] October 2024,[9] August 2025,[10] and March 2026.[11] Alliance has made seventeen distributor acquisitions since 2019, representing a major consolidation of power.[12]

### C.    PayRange's BluKey Products

23.     There are two primary methods that commercial laundry machines equipped with payment processing technology use for accepting payments. PayRange offers payment solutions for each of these methods. The first method is referred to as the "pulse" method, whereby a

---

[7] Alliance Laundry Systems, *Alliance Laundry Systems Distribution Expands South Region with Acquisition* (July 1, 2024), https://distribution.alliancelaundry.com/news/alliance-laundry-systems-distribution-expands-south-region-with-acquisition (last visited May 29, 2026).

[8] Alliance Laundry Systems, *Alliance Laundry Systems Acquires Salt Lake City Distributor* (Sept. 9, 2024), https://distribution.alliancelaundry.com/news/alliance-laundry-systems-acquires-salt-lake-city-distributor (last visited May 29, 2026).

[9] Alliance Laundry Systems, *Alliance Laundry Systems Distribution Expands West Region with Acquisition* (Oct. 2, 2024), https://distribution.alliancelaundry.com/news/alliance-laundry-systems-distribution-expands-west-region-with-acquisition (last visited May 29, 2026).

[10] Alliance Laundry Systems, *Alliance Laundry Systems Distribution Expands East Region with Acquisition* (Aug. 1, 2025), https://distribution.alliancelaundry.com/news/alliance-laundry-systems-distribution-expands-east-region-with-acquisition (last visited May 29, 2026).

[11] Alliance Laundry Systems, *Alliance Laundry Systems Distribution Expands East Region with Acquisition* (March 6, 2026), https://distribution.alliancelaundry.com/news/alliance-laundry-systems-distribution-expands-northeast-with-acquisition (last visited May 29, 2026).

[12] Alliance Laundry Systems, *Alliance Reports First Quarter 2026 Results* (May 12, 2026), https://www.prnewswire.com/news-releases/alliance-reports-first-quarter-2026-results-302768730.html (last visited May 29, 2026).

connected device mimics the electrical signal of coins being inserted into the machine. After a user pays digitally via their mobile app, the app then sends a series of electric "pulse" signals to the laundry machine's controller, which simulates coins dropping into the machine, and activates the machine's operations.

24.    The "pulse" signals are not proprietary or patented technology.

25.    The second method is referred to as the "serial bus protocol" method, whereby a connected device has two-way communications with the laundry machine. Serial bus technology is a communication system used throughout the computing and telecommunication industries that sends data sequentially, one bit at a time, over a single communication channel. For Alliance laundry machines, the serial bus protocol method involves the transmission of a series of codes back and forth between the device and the laundry machine's controller, allowing payment, multi-tier pricing and different cleaning options, as well as real-time status and error reporting. Serial bus communication also allows the laundry machines to send information to the users, including the amount of time left in the cycle and notice of any machine errors.

26.    As relevant to the laundry industry, PayRange manufactures two lines of patented devices using its BluKey technology: BluKey and BluKey Pro. BluKey and BluKey Pro can both be installed using the "pulse" method or the "serial bus" method.

27.    Laundromat operators or multi-family route laundry operators who choose PayRange as their payment services solution plug their BluKey device (be it the BluKey or the BluKey Pro) inside individual washers and dryers, typically next to the control panel, as demonstrated in the photo below:

8



Image: BluKey Device Being Plugged into Laundry Machine

28.    Up until recently, the majority of PayRange's customers almost exclusively deployed BluKey in "pulse" mode. As of April 2026, approximately 73% of PayRange BluKey devices in the industry market were utilizing the "pulse" technology (whether through BluKey or BluKey Pro).





BluKey



BluKey Pro

**D.      Agreements Between PayRange and Alliance**

29.      In 2014, an Alliance distributor introduced PayRange to Alliance, and Alliance then offered access to its laundry machines' protocol specifications to encourage PayRange to develop a payment solution compatible with Alliance-manufactured machines.

30.      On April 23, 2014, PayRange (formerly known as PayRange Inc.) and Alliance executed a Confidentiality and Non-Disclosure Agreement ("Non-Disclosure Agreement"). Exhibit A (Non-Disclosure Agreement). The Non-Disclosure Agreement provided that Alliance "is disclosing and/or may hereafter disclose certain proprietary information which pertains to the design, production, development, or evaluation of products by" PayRange. Exhibit A, 1. Paragraph 4 of the Non-Disclosure Agreement provides that the "foregoing obligations of secrecy do not apply to any Confidential information which is: (a) Known and in the possession of the Receiving Party when received or thereafter developed independently by Receiving Party without the benefit of information disclosed hereunder; or (b) In the public domain when received or thereafter in the public domain through no fault of the Receiving Party[.]" Exhibit A, ¶ 4. Paragraph 7 of the Non-Disclosure Agreement provides that the "Agreement shall terminate on its tenth (10) anniversary, or it may be terminated at any time by either party by giving 30 days written notice of termination. The requirements of confidentiality shall continue until the tenth (10) anniversary of this Agreement, notwithstanding prior termination." Exhibit A, ¶ 7.

31.      After PayRange and Alliance executed the Non-Disclosure Agreement, Alliance provided the specifications that PayRange could use to help develop the serial bus protocol for PayRange products that could be incorporated into Alliance machines.

32.      Pursuant to the 2014 Non-Disclosure Agreement, Alliance provided PayRange with three different specifications documents: (i) MDC Card Reader Design Specifications, dated

January 20, 2010; (ii) Centurion Card Reader Project Design Specifications, dated February 17, 2012; and (iii) ACA Card Reader / Payment System Interface Design Specifications, dated May 4, 2015.

33.     By 2016, PayRange had developed a functioning serial bus protocol and product that was working on Alliance machines.

34.     The confidentiality obligations set forth in the Non-Disclosure Agreement expired by the Non-Disclosure Agreement's own terms on April 23, 2024.

35.     On March 5, 2018, PayRange and Alliance executed a Control Interface Specification License Agreement ("Control Interface Specification License" or the "License"). This License provided that Alliance granted a license to PayRange to use "certain equipment control interface specifications" in order "to develop a vended payment system" compatible with Alliance's "commercial laundry equipment." Exhibit B (Control Interface Specification License), Recitals. Alliance granted the license "pursuant to [Alliance's] development partner certification process" and effected the license by "deliver[ing] the Specifications to [PayRange] via electronic transmission of a data file." Exhibit B, ¶ 2.

36.     Paragraph 1 of the License provides that: Alliance "hereby grants [PayRange] the non-exclusive right to use the Specifications **for the purposes of developing the System**." Exhibit B, ¶ 1. (emphasis added).

37.     Thus, the purpose of the License was for Alliance to provide PayRange access to certain documents that detailed Alliance's specifications so that PayRange could develop a "vended payment system" that would be "compatible with" Alliance laundry machines.  Exhibit B, Recital B. Further, nothing in the License gives Alliance control over the sale of PayRange products moving forward. Alliance's rights under the License govern the documents provided (*i.e.,*

11

the "specifications") but do not give Alliance a right to control technology developed by PayRange. PayRange's technology uses code that was developed *by PayRange*. The documents Alliance provided containing its specifications do not contain any source code. PayRange's products, once developed, stand entirely outside the scope of the License. Had the License included a provision giving Alliance the right upon termination to stop PayRange from supporting or selling PayRange products using the "System" that PayRange developed, PayRange would not have signed the License.

38.    The 2018 Control Interface Specification License was prospective.  The License does not alter the parties' agreement regarding documentation that PayRange had already received pursuant to the Non-Disclosure Agreement in 2014.  To the extent PayRange's products, as they exist today, were developed using any of the specifications Alliance provided to PayRange prior to the parties signing the 2018 License, those specifications are not governed by either the 2014 Non-Disclosure Agreement (which expired by its own terms in 2024) or the License signed in 2018 (since the License covers only prospective development work using specifications provided prospectively, pursuant to that 2018 License).

39.    The specifications that Alliance provided to PayRange under the 2018 Control Interface Specification License did not change the core functionality of the products that PayRange developed before executing the License. In other words, the specifications Alliance provided to PayRange pursuant to the 2018 License only resulted in minor, incremental changes to the product that PayRange had already developed.

40.    Paragraph 4(a) of the License provides that either party "may terminate this Agreement at any time for any reason or no reason, upon at least sixty (60) days' written notice." Exhibit B, ¶ 4(a).

12

41.     Paragraph 4(b) of the License, "Retention of Specifications," provides the following:

Notwithstanding anything in the Agreement to the contrary, in addition to any other rights or remedies afforded Licensor by law, either (i) upon termination of this Agreement, or (ii) if Licensee is in default under this Agreement, Licensor may, without notice to or demand upon Licensee, re-take possession of the Specifications and terminate Licensee's license to use the same; provided, however, that nothing in this paragraph shall impair an end-user's ability to use Equipment which was sold or otherwise provided by Licensee to such end-user prior to the termination of this Agreement.

Exhibit B, ¶ 4(b).

42.     This provision requires PayRange to return the Specifications and terminates PayRange's rights to use the Specifications that Alliance had provided for further development.

43.     The provision makes clear that Alliance's termination of the License has no effect on end-users of Alliance machines equipped with PayRange technology. In other words, Alliance cannot do anything that would "impair" an existing PayRange user's ability to continue using PayRange following the termination.

44.     There is no provision in the License that requires PayRange to abandon the "system" that it developed or to stop selling any of PayRange's products.

45.     Had the License included a provision giving Alliance the right upon termination to stop PayRange from supporting or selling products using the "System" that PayRange developed, PayRange would not have signed the License.

**E.     Alliance's Previous Efforts to Block Payment-Processing Competition**

46.     In January 2020, Alliance enacted "restrictions" on card reader programming and data that were intended to block the solutions offered by third-party payment companies from working with Alliance's laundry machine brands.

47.     Alliance's customers were very unhappy about this development because they value and rely on payment solutions such as PayRange. Most commercial laundry facilities have

13

multiple machine brands on premises, making the use of brand-specific payment app solutions cumbersome and, at times, technologically infeasible. Because PayRange's technology is "brand agnostic" (*i.e.*, it works across all major brands), it is far more efficient and cost-effective than payment solutions that only work with specific brands' machines. Moreover, PayRange's solution offers features and capabilities that do not exist in Alliance's payment app, such as the ability to function without Wi-Fi through Bluetooth technology and the ability to retrofit to existing machines in the field as well as work with new machines.

48.     In May 2020, after considerable push-back from their customers, Alliance reluctantly relented and restored third-party access. Alliance was unable to force customers to use its own payment solutions because they were inferior products that lacked many of the features customers valued and needed. Customers rebelled at the prospect of being forced to run fragmented, disjointed systems where older Alliance machines could potentially still work with third-party payment solutions whereas new machines would not.

49.     Even the Multi-Housing Laundry Association (the "MLA"), the North American trade association for operators and supplier companies that provide professional laundry services for the multi-housing industry, came out against Alliance's draconian attempt to unilaterally, and without justification, block all third-party payment solutions long used and valued by operators.

50.     But Alliance's retreat was only temporary. Since 2020, Alliance has amassed even more sway, acquiring distributors and demonstrating a willingness to flex its market power. Far from coming to its senses in May 2020, Alliance was merely waiting until such time as it had amassed a critical monopoly power to thwart any customer opposition to its exclusionary conduct.

51.     In the last three to four years, Alliance developed its payment solutions to the point where it could force customers to adopt them free of objections that such solutions lack crucial

14

functionality. In other words, Alliance has created "good enough" payment solutions that it now plans to impose on customers against their will. As described below, Alliance's first major effort to do so is an anticompetitive campaign of exclusion and disparagement against PayRange, which offers customers' preferred payment solution.

52.    PayRange's customers, including commercial laundry equipment distributors and commercial laundry facility operators, have stated that Alliance has made it clear that it wants them to use only Alliance's payment system. Alliance wishes to foreclose competition regardless of the costs on customers or the consequences for innovation and product quality.

### F.    Alliance Terminates the License and Misrepresents the Consequences

53.    On April 8, 2026, Alliance sent a letter to PayRange terminating the Control Interface Specification License (such letter, the "Notice of Termination of the License"). In its letter, Alliance notified PayRange that Alliance intended to terminate the License effective as of June 8, 2026. Exhibit C (Notice of Termination of the License), 1. After June 8, Alliance claimed, "any PayRange technology (including PayRange's BluKey connectors) will not be authorized to work with any Alliance machines." Exhibit C, 1. Alliance offered no explanation for this abrupt termination.

54.    On or around April 14, 2026, Alliance sent emails to approximately 75 PayRange customers who sell and/or operate Alliance machines. These 75 customers represent the bulk of PayRange's customers by sales volume. The email made the following statements to the PayRange customers:

> **We control third-party payment system access.** PayRange's ability to integrate with Alliance equipment existed only through a control interface license that we previously granted. However, we have terminated that license with PayRange, which will be effective June 8, 2026. After this date, any PayRange technology (including PayRange's BluKey connectors) will not be authorized to work with any Alliance machines on a go-forward

basis. PayRange technology (including BluKey connectors) for Alliance machines sold prior to June 8, 2026 will not be affected at this time.

Exhibit D (Alliance April 14, 2026 Email to Customers) (bolded language in original).

55. Shortly after sending these emails, Alliance held a conference call with PayRange's customers to reinforce and discuss the same message.

56. Alliance sent these emails and hosted this conference call days before a significant industry event, hosted by the MLA on April 20-22, 2026.

57. Alliance's statement in the Notice of Termination of the License that "any PayRange technology (including PayRange's BluKey connectors) will not be authorized to work with any Alliance machines" is false.

58. Similarly false is Alliance's statement to customers that "PayRange's ability to integrate with Alliance equipment existed only through a control interface license." Exhibit D (Alliance April 14, 2026 Email to Customers).

59. ***First***, Alliance's purported termination of the License does not prevent PayRange's future manufacture and sale of PayRange devices compatible with Alliance machines. The termination of the License permits Alliance to "re-take possession of the Specifications" and to "terminate [PayRange's] license to use the same" (*i.e.*, the Specifications documentation), meaning that PayRange must return the documentation containing the Specifications, and PayRange must not use the Specifications provided by Alliance in PayRange's future development projects. Alliance has no right to prevent PayRange from building and selling devices that ***PayRange*** has already developed. Alliance has no right to prevent PayRange from building and selling devices that are compatible with Alliance machines Alliance's statements to the contrary are false. Indeed, the License specifically states that Alliance grants PayRange "the non-exclusive right to use the Specifications ***for the purposes of developing the*** System." Exhibit B (License), at ¶ 1 (emphasis

16

added). There is no provision in the License that requires PayRange to abandon the "system" that it developed or to stop selling any of PayRange's products upon termination of the License. Alliance cannot use an agreement that was only intended to facilitate Alliance sharing certain documents with PayRange (to facilitate PayRange's own development work) to force PayRange to cease all of its product sales. Such an interpretation is contrary to the language of the License and the intent of the parties, and it defies common sense.

60. ***Second***, these statements are false because the License does not (and cannot) govern PayRange's pulse technology because pulse technology does not use or require any serial interface specifications to function. The "pulse" signal itself is not proprietary or patented technology, and PayRange technology that uses the "pulse" method was developed independently of Alliance specifications. As of April 2026, 73% of PayRange devices in the laundry sector were using pulse. Any purported termination of the License is irrelevant with respect to PayRange's pulse technology, and PayRange's pulse devices, including PayRange's BluKey connectors, are clearly permitted to continue "work[ing] with any Alliance Machines" after June 8, 2026. Alliance's statement to the contrary is false.

61. ***Third,*** these statements are false because the License expressly states that "nothing in this paragraph shall impair an end-user's ability to use Equipment which was sold or otherwise provided by Licensee to such end-user prior to the termination of this Agreement." Exhibit B (License), ¶ 4(b). Alliance's statement that PayRange technology will not be authorized to work with ***any*** Alliance Machines after June 8, 2026 contradicts the terms of the License Agreement. This applies with equal force to both (a) the devices that are already in the end-user's possession and (b) the already-sold devices currently in PayRange's inventory.

17

62.    ***Fourth***, these statements are false with respect to KioSoft technology. KioSoft products were developed separately and independently from PayRange's License. While KioSoft products are now part of "PayRange's technology" (since PayRange owns and sells KioSoft products), the termination of the License would not affect KioSoft technology, and Alliance's statements to the contrary are false. On information and belief, Alliance admitted in its conference call with PayRange's customers that the termination of the License would not affect the KioSoft technology, "for now."

63.    ***Finally***, Alliance's statement in its email to customers that Alliance "control[s] third-party payment system access" is false. Once a laundromat operator or a commercial laundry equipment distributor has purchased an Alliance laundry machine, the customer is legally permitted to choose which third-party payment system to utilize. Alliance's statement to the contrary is false.

64.    While warning customers away from PayRange's payment systems, Alliance pushed customers toward using Alliance's own systems: "**Your use of our equipment and digital technology does not put you at risk**. To the extent you use Alliance digital products and payment solutions, you do so under a technology license from Alliance. We stand behind our products and the technology we provide and we refer you to our license agreement for any concerns you may have." Exhibit D (Alliance April 14, 2026 Email to Customers) (bolded language in original).

65.    It is improper for Alliance to make disparaging and false statements about PayRange's business rights to PayRange's customers. It is also improper for Alliance to deny PayRange's customers' right to choose the payment and management solution that works best for their businesses and the laundry machines they own. And it is improper for Alliance to attempt to

18

force out competition in the payment and management solution market by employing a campaign to intimidate customers into using Alliance's competing product over PayRange's products.

**G.      Alliance's Interference Creates Concern and Confusion for PayRange's Customers**

66.      Since Alliance's April 14, 2026 email, customers have expressed concern to PayRange about how Alliance's actions will impact their business operations going forward. Customers have questioned whether they are permitted to continue using any PayRange products after June 8, 2026. Customers have expressed fear that Alliance will refuse to sell machines to them in the future if the customers continue to use PayRange products. Customers have also expressed fear that alternatively, Alliance will impose massive price hikes on customers when they purchase new machines in the future.

67.      One of the customers that received Alliance's April 14, 2026 email was National Laundry Equipment, a national commercial laundry machine equipment distributor. National Laundry Equipment regularly publishes a blog on its website, "The Successful Commercial Laundry - A Laundromat Blog." After receiving Alliance's April 14, 2026 email regarding PayRange, National Laundry Equipment published a blog post on April 21, 2026, titled "Update on Alliance Laundry Systems, PayRange, and Future Compatibility."[13] Exhibit E ("Update on Alliance Laundry Systems, PayRange, and Future Compatibility" blog post).

68.      This blog post discussed the contents of Alliance's April 14, 2026 email, and what impact Alliance's statements are likely to have on PayRange's customers. The post opens by stating: "Many customers have asked what is going on between Alliance Laundry Systems and

---

[13]  National Laundry Equipment, *Update on Alliance Laundry Systems, PayRange, and Future Payment Compatibility* (April 21, 2026), https://www.nationallaundryequipment.com/update-on-alliance-laundry-systems-payrange-and-future-payment-compatibility (last visited May 29, 2026).

19

PayRange, and what it means for stores that use Alliance equipment together with PayRange or KioSoft products." Exhibit E ("Update on Alliance Laundry Systems, PayRange, and Future Compatibility" blog post). The post continues, stating that based on Alliance's April 14, 2026 email, Alliance "has terminated PayRange's control-interface license effective **June 8, 2026**," and "Alliance also says that after that date, PayRange technology, including BluKey connectors, will not be authorized on a go-forward basis to work with Alliance machines." *Id*. (emphasis in original). The post reports that "Alliance's own parts channel currently lists multiple PayRange OEM items as **sold** and **no longer available with no replacement**, including Alliance-, Huebsch-, and Speed Queen-branded PayRange parts." *Id*. (emphasis in original). The post warns that if a customer is considering purchasing new Alliance machines and the customer wants to use PayRange after June 8, 2026, "you should assume there may be authorization, compatibility, support, or warranty questions unless you receive written confirmation otherwise from the relevant parties." *Id*. The post further advises that customers should "not assume that a connector or interface that works on a grandfathered machine can simply be moved to a future machine and remain authorized," based on Alliance's April 14, 2026 email. *Id*.

69.     Upon searching for PayRange compatible products on Alliance's website, the website indicates that multiple PayRange compatible products are "no longer available with no replacement."[14]

70.     PayRange has already suffered reputational and economic harm as a result of Alliance's communications, as demonstrated by the "Update on Alliance Laundry Systems,

---

[14] *PayRange Mobile Payment Systems*, https://parts.alliancelaundry.com/c-1136828-payrange-mobile-payment-systems.html (last visited May 29, 2026).

PayRange, and Future Compatibility" blog post, and the customer confusion and questions described therein.

71.    For example, after receiving the April 14, 2026 email from Alliance, one of PayRange's largest customers emailed PayRange on May 7, 2026, expressing that they "need to know if we need to start looking for another mobile platform come June 8th or, if we can continue using PayRange (pulse). This is what we prefer of course."

72.    Another PayRange customer emailed PayRange on April 15, 2026, stating they "received very concerning news this week" and asked "[w]ill this get resolved, or do we need to pivot our business to another mobile app provider?" On April 30, 2026, the same customer emailed PayRange again, stating that they "are hoping that things work out so we can continue to put [PayRange]'s mobile app on our machines after June 8th. The sooner we have confirmation, the sooner we can stop looking into other options."

73.    Customers have expressed to PayRange through in person conversations at industry events that they are fearful of Alliance's industry power, and the leverage Alliance has to raise customers' prices, impose unfavorable business terms on customers, and limit customers' ability to acquire new Alliance machines.

74.    Customers have expressed to PayRange through in-person conversations at industry events that they may have to end their business relationships with PayRange to use a different payment solution that is blessed by Alliance. This is a direct result of the April 14, 2026 email from Alliance to customers.

75.    Multiple PayRange customers have verbally expressed to PayRange that they wish to place any future orders with PayRange on hold or do not wish to renew their orders with PayRange. This is a direct result of the April 14, 2026 email from Alliance to customers.

76.    PayRange's negotiations with prospective customers have been hampered by the statements in Alliance's April 14, 2026 email to customers.  This is a direct result of the April 14, 2026 email from Alliance to customers.

77.    PayRange's sales for its KioSoft products division for the month of April 2026 fell short of projections by approximately $550,000. This is a direct result of the April 14, 2026 email from Alliance to customers.

### H.    Alliance Has Monopoly Power in the Market for Commercial Laundry Machines

#### 1.    The Relevant Markets

78.    **Commercial laundry machines** in the United States constitute a relevant antitrust product market. This market is distinct from other sectors of the market for laundry machines in that it serves distinct customers and is comprised of machines with distinctive design and operational features. Commercial laundry machines exhibit unique characteristics that machines intended and marketed for use in single family homes or for in-unit laundry in apartments do not. Customers, operators, manufacturers, distributors, and industry participants all recognize the unique and distinctive contours of this product market. There are no reasonable substitutes for commercial laundry machines, as they are the only feasible product to meet the laundry (washing and drying) needs of businesses and multi-unit residential buildings that contain communal laundry rooms.

79.    A hypothetical monopolist imposing a small but significant and non-transitory increase in the price of commercial laundry machines would not cause a sufficient number of customers to switch to other means of cleaning and drying their clothes such that the price increase would be unprofitable. Similarly, a hypothetical monopolist imposing a small but significant and non-transitory decrease in the quality of commercial laundry machines would not cause a sufficient

22

number of customers to switch to other means of laundering their belongings such that the quality decrease would be unprofitable.

80.    Within the market for commercial laundry machines, there exists a relevant antitrust submarket for **payment-enabled commercial laundry machines** in the United States. These machines require payment in order to activate. They exist principally at laundromats and in multi-unit residential buildings. Their need to charge the user for each activation and their ability to customize the features of operation and communicate with individual users distinguishes them from commercial laundry machines at other facilities, such as large commercial enterprises (*e.g.*, hospitals, gyms, hotels, etc.) at which individuals do not manage their own laundry and the machines are not pay-per-use.

81.    The **market for payment-processing technology for commercial laundry equipment** in the United States can be understood as an "aftermarket" to the primary device markets for payment-enabled commercial laundry machines. An aftermarket is a derivative market for goods or services used in conjunction with some primary product—here, Alliance laundry machines.

82.    The new restrictions on payment-processing technology that Alliance is imposing on customers were not known to customers at the time they purchased their Alliance machines. Indeed, historically Alliance machine customers have been able to use third-party payment processing technology such as that offered by PayRange.

83.    There are significant monetary and non-monetary costs associated with a customer's switching away from Alliance machines. These include the many thousands of dollars to replace the machines themselves along with significant labor to deliver and install replacements. These costs deter customers from switching away from Alliance machines.

23

84.    Both direct and indirect proof establishes Alliance's monopoly power in the United States market for commercial laundry equipment and the submarket for payment-enabled laundry facilities.

### 2.    Indirect Proof of Monopoly Power

85.    Alliance has a monopoly share of the market for commercial laundry equipment and the submarket for payment-enabled laundry facilities. Alliance is "the number one supplier of commercial laundry equipment in terms of market share" in the United States and Canada.[15] Alliance's rapid acquisition of distributors illustrates its monopoly power and intent to monopolize the market for commercial laundry equipment. In the alternative, Alliance possesses a market share sufficient to raise prices and affect output across the market. Alliance has been described as "the dominant OEM for laundromats and many on-premise laundries."[16]

86.    The market for commercial laundry equipment and the submarket for payment-enabled laundry facilities are distinct product markets for which there are no reasonably close substitutes. The machines that comprise these markets are characterized by features that distinguish them from machines that, for example, are designed and marketed for single-family homes.

### 3.    Direct Proof of Monopoly Power

87.    Having shielded itself from meaningful competition, Alliance is able to charge supracompetitive prices to customers without losing any business as a result. Customers have

---

[15]    *See* Alliance Laundry Holdings Inc., Registration Statement (Form S-1) (Sept. 12, 2025), https://www.sec.gov/Archives/edgar/data/1317685/000131768525000013/alliancelaundryholdin gsinc.htm.

[16]    *See* National Laundry Equipment, *Keeping an Eye on the Big Boys, Alliance and EVI: What They Are Doing and Why It Matters* (Nov. 13, 2025), https://www.nationallaundryequipment.com/evi-alliance-laundry-market-strategy (last visited May 29, 2026).

experienced Alliance's monopoly power first-hand in the form of increased prices and refusals to sell.

88.     PayRange customers have expressed that they are afraid that Alliance may increase the prices that it charges them for laundry machines (or refuse to sell them laundry machines altogether), void their warranties, or otherwise harm their businesses if the customers contacted PayRange in support of Alliance.

89.     Even when Alliance has raised its prices in order to punish or make an example of a customer, that customer has nevertheless made its purchases from Alliance. In other words, customers are unable to switch away from Alliance when confronted with price increases.

90.     Alliance's refusal to sell its products to customers who dared to cross Alliance also serves as direct evidence of reduced output. For example, Alliance refused to sell its machines to some distributors who resisted its acquisition overtures, cutting off an essential good until the distributor's business was so imperiled that they were forced into the acquisition.

91.     Alliance's monopoly power means that customers rely heavily on having access to the dominant product in the market. When Alliance refuses to sell its machines for anti-competitive reasons, it threatens customers' (*i.e.*, operators' and distributors') ability to run or grow their businesses. It also results in restricted output in the market for commercial laundry machines and the businesses that depend on them.

### I.     Alliance's Restrictions Serve No Procompetitive End

92.     Alliance cannot justify its coercive moves to force customers to cease using PayRange in favor of Alliance's own payment solution. Any asserted justifications by Alliance for its conduct are outweighed by the harm caused to competition and consumers.

93. Alliance's efforts to steer customers away from PayRange and into its own payment solution are plainly anticompetitive. There is no technological reason for Alliance to bar PayRange access to its machines (or at least scare customers into believing such access has been blocked). Alliance has never articulated a technical compatibility issue, security issue, or other concern with PayRange's payment solution technology.

94. Indeed, customers and operators do not want to use Alliance's payment solution because it is an inferior solution.

95. One major advantage of PayRange's payment solution over those offered by Alliance is that PayRange's product is "brand agnostic," meaning it works seamlessly across laundry machine brands. This makes it ideally suited to laundry facilities that have multiple brands of machines across their operations, as nearly all do. By contrast, the Alliance payment "solutions" work only with a single associated brand, meaning a laundromat operator would need to juggle multiple different interfaces; remember, manage, and advertise differently from brand-to-brand based on features; and could not consolidate data across machine brands.

96. Unlike competing payment solutions—including those offered by Alliance's brands—PayRange utilizes Bluetooth technology enabling app-based mobile device control and communication in the absence of Wi-Fi. This is a useful feature for multi-family laundry rooms, where Wi-Fi is often unavailable, unreliable, or costly to set up.

97. PayRange also offers unique retrofit capability in that existing machines in the field as well as new machines are all compatible with PayRange.

98. The breadth of payment options PayRange supports—including direct bank transfers, payment facilitators and digital wallets such as PayPal and Venmo, traditional credit and debit cards, and store gift cards—is unsurpassed in the market for payment-processing technology

26

for commercial laundry equipment. And as the merchant of record for payment processing, PayRange streamlines the process in a way that eliminates considerable effort that comes with any of Alliance's payment solutions.

99.    PayRange's payment solutions offer a host of features and capabilities beyond payment which include the ability for operators to market specific offers such as promotional discounts; to run and manage a loyalty and rewards program; and, a suite of data analytics so that customers can better understand and grow their business (with this picture fully capturing all machines across brands).

**J.    Alliance Unlawfully Ties its Payment-Processing Technology to its Machines**

100.    By leveraging its monopoly power in the market for commercial laundry machines to sabotage and exclude PayRange's payment processing offerings, Alliance effectively ensures that its customers use Alliance's own electronic payment solution. This constitutes a tie between Alliance's two products: the machine and the corresponding Alliance payment solution.

101.    Alliance need not block every third-party payment solution in order for its exclusion of PayRange to constitute an illegal tie. The Clayton Act expressly forbids tying that conditions the sale of goods or services on a purchaser not using the goods or services of a competitor (here, PayRange). Any remaining competition in the market for payment-processing technology for commercial laundry equipment is radically diminished if not altogether illusory. Although several other third-party payment solutions exist, none has more than a single-digit market share. Even combined, the next eight largest third-party payment solutions for laundry machines (AirWallet, Cantaloupe/Retail 365, CCI Nayax, Cents/Laundroworks, ESD, Shine Pay, SpyderWash, and Tumble) are used on fewer machines than PayRange.

27

102. Alliance tells its laundry machine customers that PayRange will not interoperate with their machines or be supported, and that they must choose another payment solution. And the payment solution that Alliance recommends is its own, through a technology license between the customer and Alliance. In its April 14, 2026 email to customers, Alliance says that customers' **"use of [Alliance's] equipment and digital technology does not put you at risk"** (Exhibit D, (emphasis in original)), suggesting the use of PayRange's (and other non-Alliance payment providers') technology *does* put customers at risk.

103. In other words, Alliance is leveraging its substantial power in the market for commercial machines to block PayRange's product, which competes with Alliance's own payment product. In this scheme, the "tying" product is the Alliance machine and the "tied" product is the Alliance payment solution.

104. Customers prefer the PayRange solution, and Alliance's conduct forces them to adopt Alliance's product against their wishes. Alliance's current actions are designed to exclude payment technology competition and seek to leverage existing market power to achieve these anticompetitive ends.

105. Alliance itself recognizes and describes its payment solutions as a distinct and separate offering from its machines. Alliance promotes its payment solution as something that works with and adds value to its machines.

106. Indeed, the desire to capture the stream of revenue from these add-on payment solutions is precisely the reason Alliance is blocking its competition in the market for payment-processing technology for commercial laundry equipment. Alliance's own regulatory filings refer

28

to "other revenue" distinct from its machine sales as including "sales of our digital products under distinct subscription agreements."[17]

107.    For example, promotional materials marketing the Speed Queen brand payment solution (called "Insights") state: "Whether you're opening a new store or upgrading an existing one, Speed Queen Insights can be paired with Speed Queen laundromat equipment to modernize your laundromat management."[18] The fact that Insights can (optionally) be "paired with" the laundry machines that exist without, prior to, and separate from the payment solution confirms the products' distinct nature.

108.    That Alliance offers several tiers (bronze, silver, and gold) of subscriptions for Speed Queen Insights further confirms that they are enhancements to the separate machines, to which they are not inextricably or necessarily linked. Moreover, the machines operate without these extra tools.

109.    The marketing and promotional materials for Alliance's Huebsch brand similarly confirm that its payment solution (known as "Huebsch Command") is a separate product from the Huebsch commercial laundry machines themselves.[19] Indeed, the Huebsch website offers the same three subscription tiers (bronze, silver, and gold) and encourages customers to "request a quote" and "start a free trial today." This language confirms that the payment solution is a separate product marketed to, among others, existing customers who already own Huebsch laundry machines.

---

[17]  *See* Alliance Laundry Holdings Inc., Quarterly Report (Form 10-Q) (May 12, 2026), https://ir.alliancelaundry.com/financial-information/all-sec-filings/content/0001317685-26-000015/all-20260331.htm.

[18]  Speed Queen, *Speed Queen Insights*, https://speedqueencommercial.com/en-us/insights (last visited May 29, 2026).

[19]  Huebsch, *Huebsch Command*, https://huebsch.com/command (last visited May 29, 2026).

110.    As yet another example, the marketing materials published by Alliance brand IPSO about its payment solution ("IPSO CONNECT") also establish that the payment solution is a distinct and separate product from the machines themselves. IPSO encourages customers to "Contact your distributor and ask for our IPSO CONNECT Digital Laundromat Solution, provide all the details about number of machines, dimensions of your laundromat and other capabilities you would like to manage with the solution. Our sales team will give you all the details and support to make your laundromat as smart as you are."[20] This language makes no sense if the machines and IPSO CONNECT are a single, unitary product.

111.    In the absence of Alliance's anticompetitive conduct, customers would not want to use Alliance's payment technology. Alliance is exploiting its power to induce customers for one product (machines) to also buy and use a second product (payment technology).

112.    Alliance has exploited the substantial demand for its machines to condition sales on use of its payment technology.

113.    The tie affects a significant volume of commerce, as Americans pay an estimated $16.746 billion in laundry and dry-cleaning payments annually.[21]

**K.    Alliance Locks In, Then Exploits, Its Machine Customers**

114.    As described above, Alliance has engaged in anticompetitive conduct designed to block competition for payment solutions from PayRange. Alliance is able to exploit its machine customers in the aftermarket for payment solutions because they are subject to a "lock in."

---

[20]  IPSO, *IPSO CONNECT*, https://ipso.alliancels.net/connect/AI20-1055_Brochure_IPSO%20Connect_en-WW.pdf (last visited May 29, 2026).

[21]  U.S. Bureau of Economic Analysis, *Personal consumption expenditures: Laundry and dry cleaning services [DDRYRC1A027NBEA]*, https://fred.stlouisfed.org/series/DDRYRC1A027NBEA (last visited May 29, 2026).

115.    Alliance's machine customers own expensive, durable laundry machines that can last decades. These customers cannot switch to other machine brands or new models without great financial and other costs. Under these prohibitive switching costs, Alliance's machine customers are bound to use (or not use) only products, such as payment processing technology, that interoperate with those machines.

116.    Customers that purchased Alliance machines did not know they would be prohibited from using PayRange and would be locked into a less desirable payment solution. These Alliance customers could not have known that Alliance would execute a scheme to exclude payment solution providers at customers' expense, coercing them to use Alliance's inferior and more costly payment product.

117.    Alliance has effectively threatened the ability of all machine customers to use any third-party payment solution by strongly implying that only the Alliance payment solution is safe and reliable. *See* Exhibit D (Alliance's April 14, 2026 email to customers stating that "Your use of our equipment and digital technology does not put you at risk.").

### L.      Antitrust Injury

118.    As a direct result of Alliance's anticompetitive conduct alleged herein, PayRange has suffered losses to its business or property and will continue to lose business and customer goodwill. This injury was the intended goal of Alliance's efforts to coerce distributors, operators, and other customers to abandon PayRange's payment solutions. Indeed, Alliance essentially confessed its aims with respect to its digital payment solutions when it stated that the "convergence

of physical and digital innovation creates **significant competitive barriers**" that it plans to exploit.[22]

119. Alliance's exclusionary conduct has caused a range of anticompetitive effects, including reduced output, lower quality payment solutions, and reduced options for consumers. Alliance's goal of eliminating competition in the market for payment-processing technology for commercial laundry equipment will decrease innovation and lead to monopolization and higher prices.

120. The customers that PayRange and Alliance have in common (commercial laundry equipment distributors and operators of laundromats and multi-unit residential buildings) have been injured because they will be forced to adopt a more expensive, inferior payment processing and machine analytics technology.

121. The elimination of competition from PayRange was the purpose and direct effect of Alliance's tying conduct and attempted monopolization.

122. Because Alliance continues to engage in the anticompetitive practices alleged herein, PayRange is reasonably likely to incur additional injury in the form of lost business and reputational harm. Both the actual harm and the threat of future harm are cognizable antitrust injuries directly caused by Alliance's violations of federal antitrust laws. The full amount of such damages will be calculated after discovery and upon proof at trial.

---

[22] *See* Alliance Laundry Holdings Inc., Annual Report (Form 10-K) (March 13, 2026), https://ir.alliancelaundry.com/financial-information/all-sec-filings/content/0001317685-26-000011/all-20251231.htm (emphasis added).

## V.    CLAIMS FOR RELIEF

### <u>COUNT I -</u>

### <u>Violation of the Sherman and Clayton Acts - Tying, 15 U.S.C. §§ 1, 2, 14</u>

123.    PayRange realleges and incorporates by reference the foregoing allegations as though they were fully set forth in this paragraph.

124.    Section 1 of the Sherman Act presumptively condemns tying arrangements because of their likelihood to suppress competition, denying free access to the market for tied products and harming competitors, purchasers, and end-user consumers.

125.    Section 2 of the Sherman Act also prohibits tying arrangements that leverage significant power in the market for the tying product.

126.    Section 3 of the Clayton Act likewise forbids tying arrangements when it provides that it "shall be unlawful for any person engaged in commerce" to sell goods "on the condition, agreement, or understanding" that a purchaser will "not use or deal in the goods … of a competitor" where the effect of such condition lessens competition.

127.    Alliance possesses monopoly power in the market for commercial laundry machines and submarket for payment-enabled commercial laundry machines. In the alternative, Alliance possesses sufficient market power in these markets to coerce customers to use the product it ties to them.

128.    Alliance has tied its payment-processing technology for commercial laundry equipment to its payment-enabled commercial laundry machines, thereby coercing customers to use Alliance payment-processing solutions and restraining competition.

129.    Alliance's tying arrangement has substantially foreclosed competition in the market for payment-processing technology for commercial laundry equipment, reducing quality and output in this market.

33

130. The market for payment-processing technology for commercial laundry equipment is distinct and separate from the market for payment-enabled commercial laundry machines. Alliance's unlawful tying arrangement ties two separate products that are in two separate markets.

131. Alliance imposes a tie on its laundry machine consumers by preventing them from using PayRange payment-processing technology for commercial laundry equipment. By virtue of Alliance's tying conduct, in essence consumers' only option for payment-processing technology is the Alliance solution.

132. Alliance's conduct forecloses competition in the market for payment-processing technology for commercial laundry equipment. Given the volume of transactions and the money at issue, Alliance's conduct affects a substantial volume of commerce in that market.

133. Alliance's April 2026 announcement effectively conditions the sale of its machines upon the buyer's agreement to use Alliance's own payment solution and discontinue PayRange's superior, competing payment solution.

134. Given Alliance's monopoly power in the tying market for commercial laundry machines, and the substantial effect on commerce in the tied market for payment-processing technology for commercial laundry equipment, this tie is *per se* unlawful.

135. There is no valid business necessity or procompetitive justification for Alliance's conduct. Instead, Alliance's actions are designed to destroy competition in the market for payment-processing technology for commercial laundry equipment as alleged herein.

136. To the extent there are available, non-pretextual procompetitive justifications for Alliance's conduct, there exist less restrictive alternatives to achieve any such justifications.

137. Moreover, Alliance's behavior fails a balancing test between anticompetitive harms and procompetitive benefits.

34

138.    Alliance's tying arrangement has caused PayRange injury as a direct and proximate cause of this unlawful conduct. PayRange will continue to be injured in its businesses and property as a result of Alliance's conduct, including by way of losing revenue and customer goodwill. PayRange has suffered and will continue to suffer damages and irreparable injury, including ongoing harm to its business, and such damages and injury will not abate until the Court issues an injunction ending Alliance's anticompetitive conduct.

## COUNT II -

### Violation of the Sherman Act - Attempted Monopolization, 15 U.S.C. § 2

139.    PayRange realleges and incorporates by reference the foregoing allegations as though they were fully set forth in this paragraph.

140.    Through the anticompetitive conduct described herein, Alliance has attempted to monopolize the market for payment-processing technology for commercial laundry equipment.

141.    Alliance's anticompetitive conduct has given Alliance a monopoly or, at least, a dangerous probability that it will achieve monopoly power in the market for payment-processing technology for commercial laundry equipment.

142.    Alliance has a specific intent to achieve monopoly power in the market for payment-processing technology for commercial laundry equipment.

143.    Alliance has the power to exclude competition in the market for payment-processing technology on Alliance machines, and it has willfully used that power, including by way of its unlawful practices in restraint of trade as described herein, in an attempt to achieve, maintain, and expand its monopoly power in the market for payment-processing technology for Alliance commercial laundry equipment.

144.    Alliance has exercised and leveraged its power in the market for payment-enabled commercial laundry machines to exclude competition in the market for payment-processing technology for commercial laundry equipment.

145.    Alliance's attempt to obtain a monopoly in the market for payment-processing technology for commercial laundry equipment has resulted in the foreclosure of competition, and diminishment of consumer choice and innovation.

146.    There is no valid pro-competitive justification for Alliance's conduct.

## COUNT III -

## False Advertising Under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B)

147.    PayRange realleges and incorporates by reference the foregoing allegations as though they were fully set forth in this paragraph.

148.    Alliance and PayRange are competitors in the market for payment-processing technology for commercial laundry equipment. Alliance manufactures, distributes, and sells commercial laundry equipment that many laundry operators and distributors use with PayRange's products. Alliance also develops and sells its own payment-processing technology that competes directly with PayRange's products.

149.    On April 14, 2026, Alliance sent emails to approximately 75 PayRange customers, who comprise a substantial portion of the unattended retail commercial-laundry payment-solutions industry. Shortly thereafter, Alliance held a conference call with those customers to reinforce the same message communicated in the emails. These communications constitute commercial advertising or promotion within the meaning of Section 43(a)(1)(B) of the Lanham Act. The communications were: (i) commercial speech, (ii) made by a competitor of PayRange, (iii) made for the purpose of influencing customers to stop purchasing PayRange's payment products and to

purchase Alliance's competing payment products instead, and (iv) disseminated sufficiently to the relevant purchasing public within the unattended retail commercial-laundry payment-solutions industry to constitute advertising or promotion in that industry.

150. In these communications, Alliance made statements of fact about PayRange's products, including: (a) that "any PayRange technology (including PayRange's BluKey connectors) will not be authorized to work with any Alliance machines on a go-forward basis" after June 8, 2026; (b) that "PayRange's ability to integrate with Alliance equipment existed only through a control interface license"; and (c) that Alliance "control[s] third-party payment system access." Each of these statements is false.

151. Alliance's statements actually deceived or had the tendency to deceive a substantial segment of their intended audience. Customers receiving the communications expressed confusion and concern to PayRange about whether they could continue to use PayRange products with Alliance machines.

152. Alliance's statements were material. They concerned the continued authorization, compatibility, and supportability of PayRange's products with Alliance machines, which is the central consideration to customers deciding on unattended retail payment-processing solutions in the laundry industry.

153. Alliance's statements were made and disseminated in interstate commerce. The communications were sent by Alliance, headquartered in Wisconsin, to customers operating across the United States. As a direct and proximate result of Alliance's false and misleading statements, PayRange has suffered and will continue to suffer reputational and economic damages, including but not limited to lost revenue from customers who have ceased purchases of PayRange products,

37

customers who have not renewed or extended existing contractual arrangements, and prospective customers who have declined to enter contractual arrangements with PayRange.

154.    Alliance's conduct was willful and made with knowledge of the falsity of its statements, or with reckless disregard for their truth or falsity, rendering this an exceptional case within the meaning of 15 U.S.C. § 1117(a) and entitling PayRange to recover reasonable attorney fees.

155.    PayRange is entitled to injunctive relief under 15 U.S.C. § 1116, damages, Alliance's profits, and costs under 15 U.S.C. § 1117(a), and such other relief as the Court deems just and proper.

## COUNT IV -

### Tortious Interference with Contractual or Prospective Contractual Relationship

156.    PayRange realleges and incorporates by reference the foregoing allegations as though they were fully set forth in this paragraph.

157.    PayRange has long-standing contractual business arrangements with its laundry customers, many of whom use PayRange technology in conjunction with Alliance laundry machines. These contractual relationships contemplate continued future payments and yield future economic advantage for PayRange. PayRange's installed base of approximately 1,000,000 mobile payment devices in the marketplace reflects existing customer relationships from which PayRange expected continued and renewed business.

158.    PayRange regularly continues, renews, and extends these contractual relationships, and develops new contractual relationships with prospective customers.

38

159. Alliance has at all relevant times been aware that PayRange's customers contract with PayRange to use PayRange's mobile payment technology in conjunction with Alliance laundry machines.

160. Alliance intentionally interfered with the contractual and prospective contractual relationship between PayRange and PayRange's current and prospective customers when, on April 14, 2026, Alliance sent an email to PayRange's customers and subsequently hosted a conference call with PayRange's customers, in both of which Alliance made false and misleading statements about PayRange's technology, about Alliance's Notice of Termination of the License, and about the customers' continued ability to use PayRange's mobile payment technology with Alliance equipment.

161. Alliance knew that its statements to PayRange's customers were certain, or substantially certain, to interfere with the contractual and prospective contractual relationships between PayRange and its current and prospective customers, by causing those customers to turn away from PayRange's products, terminate existing contractual arrangements with PayRange, and decline to enter new contractual arrangements with PayRange.

162. Alliance's interference was without justification or privilege. Alliance's statements include the following false statements of fact concerning PayRange: (a) that "any PayRange technology (including PayRange's BluKey connectors) will not be authorized to work with any Alliance machines on a go-forward basis" after June 8, 2026; (b) that "PayRange's ability to integrate with Alliance equipment existed only through a control interface license"; and (c) that Alliance controls "third-party payment system access."

163. Each of those statements is false. As alleged above, the License does not govern PayRange's pulse technology, which does not require Alliance's specifications to function; the

License expressly preserves the use of devices already sold or otherwise provided to end-users prior to termination; the License does not restrict PayRange's future manufacture and sale of devices that PayRange itself developed; the License does not govern PayRange's KioSoft technology, which was developed independently of the License; and Alliance does not control third-party payment system access to laundry machines that customers have purchased and own.

164.    Additionally, the License pertains to the treatment of confidential documentation that Alliance would prospectively provide to PayRange. The License does not alter the parties' agreement regarding documentation PayRange had already received pursuant to the Non-Disclosure Agreement executed in 2014. Nor do the License's terms contemplate or restrict the prospective use or sale of payment technology that PayRange developed. PayRange's pulse and serial bus devices can therefore continue to work on Alliance machines on a going-forward basis, contrary to Alliance's statements to customers.

165.    In addition, or in the alternative, Alliance's statements are false by implication. Taken in their full context—an email from the manufacturer of the underlying laundry equipment, sent to PayRange's distributors days before a major industry event, paired with a follow-up conference call—Alliance's statements imply that PayRange's products are unauthorized, are about to stop functioning on Alliance machines, and depend on Alliance's sufferance to operate. Each of those implied facts is false.

166.    As a direct and proximate result of Alliance's interference, PayRange has suffered and will continue to suffer reputational and economic damages, including but not limited to lost revenue from customers who have ceased purchases of PayRange products, customers who have stated that they will or are cancelling orders, customers who have not renewed or extended existing

40

contractual arrangements, and prospective customers who have declined to enter contractual arrangements with PayRange.

**COUNT V -**

**Trade Libel**

167.    PayRange realleges and incorporates by reference the foregoing allegations as though they were fully set forth in this paragraph.

168.    On April 14, 2026, Alliance published written statements concerning PayRange and PayRange's products to approximately 75 PayRange customers who sell and/or operate Alliance machines. Alliance thereafter republished those statements orally during a conference call with the same audience.

169.    Alliance's statements include the following false statements of fact concerning PayRange: (a) that "any PayRange technology (including PayRange's BluKey connectors) will not be authorized to work with any Alliance machines on a go-forward basis" after June 8, 2026; (b) that "PayRange's ability to integrate with Alliance equipment existed only through a control interface license"; and (c) that Alliance "control[s] third-party payment system access."

170.    Each of those statements is false. As alleged above, the License does not govern PayRange's pulse technology, which does not require Alliance's specifications to function; the License expressly preserves the use of devices already sold or otherwise provided to end-users prior to termination; the License does not restrict PayRange's future manufacture and sale of devices that PayRange itself developed; the License does not govern PayRange's KioSoft technology, which was developed independently of the License; and Alliance does not control third-party payment system access to laundry machines that customers have purchased and own.

41

171.    Additionally, the License pertains to the treatment of confidential documentation that Alliance would prospectively provide to PayRange. The License does not alter the parties' agreement regarding documentation PayRange had already received pursuant to the Non-Disclosure Agreement executed in 2014. Nor do the License's terms contemplate or restrict the prospective use or sale of payment technology that PayRange developed. PayRange's pulse and serial bus devices can therefore continue to work on Alliance machines on a going-forward basis, contrary to Alliance's statements to customers.

172.    In addition, or in the alternative, Alliance's statements are false by implication. Taken in their full context—an email from the manufacturer of the underlying laundry equipment, sent to PayRange's distributors days before a major industry event, paired with a follow-up conference call—Alliance's statements imply that PayRange's products are unauthorized, are about to stop functioning on Alliance machines, and depend on Alliance's sufferance to operate. Each of those implied facts is false.

173.    The recipients of Alliance's communications understood the statements in the manner alleged. National Laundry Equipment, one of the recipients, published a blog post on April 21, 2026 titled "Update on Alliance Laundry Systems, PayRange, and Future Compatibility" which reported that "Alliance also says that after [June 8, 2026], PayRange technology, including BluKey connectors, will not be authorized on a go-forward basis to work with Alliance machines," and warning customers that future use of PayRange products with Alliance machines should not be assumed absent written confirmation. Other recipients contacted PayRange directly to ask whether they needed to switch to a different mobile payment provider.

174.    Alliance made the statements with actual malice.  Alliance made the statements with knowledge of their falsity or with reckless disregard for their truth or falsity. Alliance drafted

42

the License, knew the scope and limits of the rights it conveyed, knew that the License does not govern pulse technology or KioSoft technology, and knew that Paragraph 4(b) of the License preserves end-users' rights in equipment provided prior to termination. As a party to the License, Alliance knew the terms of the License do not apply to pulse technology or KioSoft technology. Alliance knows it has no legal right to unauthorize third party operators' use of PayRange or KioSoft payment solutions technology.

175.    Alliance knew or should have known that its false statements about PayRange's products would likely cause pecuniary loss to PayRange. Alliance has distributed PayRange's BluKey devices for nearly a decade. Alliance sent the false statements to 75 PayRange customers, and Alliance knew the recipients were customers who purchase PayRange and KioSoft products.

176.    Alliance's false statements have caused, and are continuing to cause, special and pecuniary damages to PayRange in an amount to be proven at trial, including: (a) a shortfall of approximately $550,000 in PayRange's KioSoft sales for April 2026; (b) cancelled orders, or the threat of cancelled orders, from one or more PayRange customers following Alliance's April 14, 2026 email; (c) the hampering of negotiations with prospective customers; and (d) lost renewals and lost prospective business from existing and prospective customers, as further alleged above.

## COUNT VI -

### Defamation

177.    PayRange realleges and incorporates by reference the foregoing allegations as though they were fully set forth in this paragraph.

178.    On April 14, 2026, Alliance published written statements concerning PayRange and PayRange's products to approximately 75 PayRange customers who sell and/or operate Alliance

43

machines. Alliance thereafter republished those statements orally during a conference call with the same audience.

179.    Alliance's statements include the following false statements of fact concerning PayRange: (a) that "any PayRange technology (including PayRange's BluKey connectors) will not be authorized to work with any Alliance machines on a go-forward basis" after June 8, 2026; (b) that "PayRange's ability to integrate with Alliance equipment existed only through a control interface license"; and (c) that Alliance "control[s] third-party payment system access."

180.    Each of those statements is false. As alleged above, the License does not govern PayRange's pulse technology, which does not require Alliance's specifications to function; the License expressly preserves the use of devices already sold or otherwise provided to end-users prior to termination; the License does not restrict PayRange's future manufacture and sale of devices that PayRange itself developed; the License does not govern PayRange's KioSoft technology, which was developed independently of the License; and Alliance does not control third-party payment system access to laundry machines that customers have purchased and own.

181.    Additionally, the License pertains to the treatment of confidential documentation that Alliance would prospectively provide to PayRange. The License does not alter the parties' agreement regarding documentation PayRange had already received pursuant to the Non-Disclosure Agreement executed in 2014. Nor do the License's terms contemplate or restrict the prospective use or sale of payment technology that PayRange developed. PayRange's pulse and serial bus devices can therefore continue to work on Alliance machines on a going-forward basis, contrary to Alliance's statements to customers.

182.    In addition, or in the alternative, Alliance's statements are false by implication. Taken in their full context—an email from the manufacturer of the underlying laundry equipment,

44

sent to PayRange's distributors days before a major industry event, paired with a follow-up conference call—Alliance's statements imply that PayRange's products are unauthorized, are about to stop functioning on Alliance machines, and depend on Alliance's sufferance to operate. Each of those implied facts is false.

183.    Alliance's statements have harmed PayRange's reputation, lowered PayRange in the estimation of the commercial-laundry payment-solutions community, and deterred PayRange's current and prospective customers from associating or dealing with PayRange.

184.    Alliance's publication of these statements was unprivileged. Alliance had no privilege, justification, or other lawful basis to make the false statements to PayRange's customers. Any privilege that might otherwise apply was forfeited by Alliance's knowledge of the statements' falsity or its reckless disregard for their truth or falsity, and by Alliance's improper purpose of inducing PayRange's customers to abandon PayRange's products in favor of Alliance's competing payment solution.

185.    Alliance made these statements with knowledge of their falsity or with reckless disregard for their truth or falsity. Alliance drafted the License, knew the scope and limits of the rights it conveyed, knew that the License does not govern PayRange's pulse technology or KioSoft technology, and knew that Paragraph 4(b) of the License preserves end-users' rights in equipment provided prior to termination. At a minimum, Alliance acted negligently in publishing the statements without regard for whether they were true.

## COUNT VII -

## Declaratory Judgment Pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202

186.    PayRange realleges and incorporates by reference the foregoing allegations as though they were fully set forth in this paragraph.

45

187. The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, authorizes the Court to "declare the rights . . . of any interested party seeking such declaration," in addition to any injunctive or other available relief.

188. In view of the foregoing, an actual controversy exists between Alliance and PayRange with respect to the effect of Alliance's Notice of Termination of the License, as well as Alliance's tortious interference with PayRange's business with its customers. This controversy is likely to continue. Further, the threat of actual and imminent injury exists to PayRange, which can be redressed by judicial relief. The injury to PayRange includes the uncertainty as to whether products that are already on the market will continue to be able to operate using PayRange's payment solutions, whether PayRange will be able to sell products it has already developed that utilize serial bus protocol technology compatible with Alliance-manufactured machines, and whether PayRange, on a going forward basis, will be able to develop and sell new products that utilize serial bus protocol technology that is compatible with Alliance-manufactured machines. Consequently, the injury is sufficiently immediate to warrant the issuance of a declaratory judgment.

189. PayRange is entitled to a declaratory judgment awarding it declaratory and injunctive relief and any other relief the Court deems just and appropriate.

## VI.    JURY TRIAL DEMAND

190. PayRange hereby demands a trial by jury of all the claims asserted in this Complaint.

## VII.    PRAYER FOR RELIEF

PayRange requests that the Court enter the following relief:

46

a)      A damages award, including treble damages or other multiple or punitive damages, or restitution, where mandated by law or equity or as otherwise available, in an amount to be proven at trial.

b)      Declare unlawful, vacate, and set aside Alliance's Notice of Termination of the License to the extent it seeks to prevent PayRange from manufacturing or selling devices and software that applies to laundry machines using the "pulse" method for any machines and devices that are already operating in the market and on a going forward basis.

c)      Grant preliminary and permanent injunctive relief to enjoin Alliance from enforcing, implementing, maintaining, or giving effect to the Notice of Termination of the License to the extent it seeks to prevent PayRange from manufacturing or selling devices and software that applies to laundry machines using the "pulse" method for any machines and devices that are already operating in the market and on a going forward basis.

d)      Declare unlawful, vacate, and set aside Alliance's Notice of Termination of the License to the extent it seeks to prevent PayRange from continuing to service the devices and machines that are using the "serial bus protocol" method that are already operating in the market.

e)      Grant preliminary and permanent injunctive relief to enjoin Alliance from enforcing, implementing, maintaining, or giving effect to the Notice of Termination of the License to the extent it seeks to prevent PayRange from continuing to service the devices and machines that are using the "serial bus protocol" method that are already operating in the market.

f)      Declare unlawful, vacate, and set aside Alliance's Notice of Termination of the License to the extent it seeks to prevent PayRange from manufacturing or selling new or additional devices and software that applies to laundry machines using the "serial bus protocol" method on a going forward basis.

47

g)      Grant preliminary and permanent injunctive relief to enjoin Alliance from enforcing, implementing, maintaining, or giving effect to the Notice of Termination of the License to the extent it seeks to prevent PayRange from manufacturing or selling new or additional devices and software that applies to laundry machines using the "serial bus protocol" method on a going forward basis.

h)      Grant preliminary and permanent injunctive relief to enjoin Alliance from (i) making statements that PayRange's products are used with Alliance equipment under a license with Alliance; (ii) making statements that Alliance controls PayRange's ability to integrate with Alliance equipment; and (iii) making statements that PayRange's technology will not be authorized to work with Alliance machines after June 8, 2026.

i)      Grant preliminary and permanent injunctive relief to enjoin Alliance from taking any steps to prevent customers and potential users from using PayRange's products.

j)      Award PayRange pre-judgment and post-judgment interest on any monetary award at the maximum rate allowed by law.

k)      Award PayRange its reasonable attorneys' fees, including under 15 U.S.C. §§ 15, 1117(a), and any other applicable statute or rule, to the extent permitted by law.

l)      Award PayRange its costs of suit, including under 15 U.S.C. § 1117(a), 28 U.S.C. § 1920, and any other applicable statute or rule, to the extent permitted by law.

m)      Grant such other relief as the Court deems just, equitable, and proper.

Dated: June 1, 2026

Respectfully submitted,

By: */s/ Adam B. Wolfson*

Adam B. Wolfson
**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Phone: (213) 443-3100
adamwolfson@quinnemanuel.com

Jonathan C. Bunge, *pro hac vice forthcoming*
Daniel R. Lombard, *pro hac vice forthcoming*
Margaret Haas, *pro hac vice forthcoming*
**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Phone: (312) 705-7400
jonathanbunge@quinnemanuel.com
daniellombard@quinnemanuel.com
margarethaas@quinnemanuel.com

Stephen Hurley
Andrew W. Erlandson
**Hurley Burish, S.C.**
33 East Main Street, Suite 400
Madison, WI  53701-1528
(T)  608-257-0945
(F)  608-257-5764
shurley@hurleyburish.com
aerlandson@hurleyburish.com

*Attorneys for Plaintiff*

49

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 1, 2026, a true and correct copy of the foregoing was served via email to Alliance Laundry Systems LLC and served on Alliance Laundry Systems' Registered Agent at the address below:

The Corporation Trust Company
Corporation Trust Center, 1209 Orange St.
Wilmington, DE 19801

/s/ *Sophia Martell*

50